IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| IHC HEALTH SERVICES, INC., dba INTERMOUNTAIN MEDICAL CENTER,<br><br>Plaintiff;<br><br>v.<br><br>CALFRAC WELL SERVICES CORPORATION,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT; GRANTING IN PART AND DENYING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 2:16-CV-1028<br><br>District Judge Jill N. Parrish |

This matter comes before the court on the parties' cross motions for summary judgment. Defendant Calfrac Well Services Corporation ("Calfrac") moved for summary judgment on each of Plaintiff's three claims on January 11, 2018 (ECF No. 22). On January 12, 2018, Plaintiff IHC Health Services, Inc. ("IHC") moved for summary judgment on all claims, as well as on its request for attorney's fees and prejudgment interest (ECF No. 23).

### I. BACKGROUND

This dispute involves the denial of benefits allegedly due under a self-funded health benefit plan. Defendant Calfrac funds and administers a health benefit plan for its employees (the "Plan") that was established and is operated under the Employee Retirement Income Security Act of 1974 ("ERISA"). Plaintiff IHC is a corporation that operates several hospitals in Utah, including Intermountain Medical Center. Nonparty UMR is a third-party claims administrator hired by Calfrac to provide administrative services for the Plan.

T.Q., a beneficiary of the Plan, was born at Intermountain Medical Center on June 10, 2014 via cesarean section after only 30 weeks of gestation. Complications resulting from his premature birth led to a lengthy period of hospitalization, and by the time T.Q. was discharged on August 17, 2014, he had incurred a hospital bill totaling $443,223.34—$368,983.43 of which Calfrac is alleged to owe after contractual adjustments.[1]

Because IHC erroneously believed that Blue Cross Blue Shield was the primary insurer,[2] IHC sought and was granted authorization for T.Q.'s care from Blue Cross Blue Shield at the time of A.Q.'s admission. IHC did not discover its error until September 9, 2014, at which point it submitted the claim to UMR. On December 26, 2014, UMR informed T.Q.'s father, the Plan participant, that Calfrac was denying the claim for failure to obtain prior authorization as required by the Summary Plan Description ("SPD" or "Plan document").[3] A subsequent appeal did not change this initial determination.

IHC filed its Complaint on October 3, 2016, alleging three counts against Calfrac: (1) for recovery of plan benefits under 29 U.S.C. § 1132(a)(1)(B); (2) for breach of fiduciary duty under 29 U.S.C. §§ 1104, 1109, and 1132(a)(2), (3); and (3) for failure to produce plan documents under 29 U.S.C. §§ 1024(b)(4) and 1132(c)(1). However, in the course of briefing the instant motions,

---

[1] Calfrac submits that it has paid $39,452.70 of this bill, which amount it claims "fully covered the 96 hours following the Cesarean section that resulted in T.Q.'s birth, as well as an additional small amount of time." Decl. of Tanya Lodge, ¶ 4.

[2] The record does not establish the source of this mistaken belief, but the parties repeatedly characterize it as a coordination of benefits error. To the extent that this error was caused by a negligent interpretation of the coordination of benefits provisions in the SPD or the Blue Cross Blue Shield plan documents, IHC may well have breached the duty of care it owed T.Q. as his attorney-in-fact.

[3] Some plans are administered by multiple documents. The Plan here was governed by a single document. *See* JAR, 29 ("This document summarizes the benefits and limitations of the Plan and will serve as the SPD and Plan document. Therefore it will be referred to as both the Summary Plan Description ("SPD") and Plan document.").

IHC conceded that (1) it cannot maintain a claim for breach of fiduciary duty alongside a claim for payment of benefits owed, (ECF No. 35 at 2), and (2) Calfrac is not liable for statutory penalties flowing from a failure to disclose plan documents, (ECF No. 37 at 8). As a result, Calfrac is entitled to summary judgment on Counts II and III of the Complaint.

The court, then, need only resolve the parties' motions as they relate to plaintiff's first Count—a claim for payment of benefits due under § 1132(a)(1)(B)—and plaintiff's request for attorney's fees and prejudgment interest.

The court held oral argument on these motions on September 19, 2018. On the basis of that hearing, the parties' briefs, and a review of the relevant law, the court grants in part and denies in part each of the motions for summary judgment.

## II. LEGAL STANDARD

### A. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." When both parties move for summary judgment in an ERISA case, thereby stipulating that a trial is unnecessary, "summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility of benefits is decided solely on the administrative record, and the non-moving party is not entitled to the usual inferences in its favor." *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 796 (10th Cir. 2010) (quoting *Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006)).

### B. STANDARD OF REVIEW FOR DENIAL OF BENEFITS

"[A] denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to

determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). If, as here, the plan explicitly vests such discretion with the administrator, a reviewing court will apply "a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious." *Weber v. GE Grp. Life Assurance Co.*, 541 F.3d 1002, 1010 (10th Cir. 2008) (internal quotation marks omitted). "Under the arbitrary and capricious standard, we curtail our review, asking only whether the interpretation of the plan was reasonable and made in good faith." *Id.* (internal quotation marks omitted).

The Tenth Circuit has enunciated a sliding scale framework for "dialing back" the level of deference accorded to an administrator's decision when, as here, the administrator is operating under a conflict of interest as both fiduciary and insurer. *See Weber*, 541 F.3d at 1010 (citing *Metro Life Ins. Co v. Glenn*, 554 U.S. 105 (2008)). An administrator's conflict of interest creates a danger of biased claims processing because "[t]he employer's fiduciary interest may counsel in favor of granting a borderline claim while its immediate financial interest counsels to the contrary." *Glenn*, 554 U.S. at 112.

A court analyzing a conflict of interest should endeavor a "combination-of-factors" review under which "[a] conflict 'should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision . . . [and] should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy. . . ." *Holcomb v. Unum Life Ins. Co. of Am.*, 578 F.3d 1187, 1193 (10th Cir. 2009) (quoting *Glenn*, 554 U.S. at 117).

Here, it is undisputed that Calfrac is operating under a conflict of interest, but the parties disagree about the weight the court ought to assign to that conflict. While both parties recite various factors relevant to a court's consideration of an administrator's conflict of interest, neither provides

4

facts sufficient to apply these factors. Instead, each party simply arrives at their preferred weight—Calfrac suggesting the conflict is de minimis and IHC urging that the conflict is "severe."

Calfrac argues that its conflict should be presumed to be a non-factor unless and until IHC carries its burden to produce facts showing that the conflict affected its denial of benefits to T.Q. But this is not an accurate statement of law. *Glenn* makes clear that each party has a burden to provide facts to inform the level of weight a court should accord a conflict of interest. To render a conflict de minimis, a conflicted administrator must show that that it "has taken steps to reduce potential bias and to promote accuracy[.]" *Glenn*, 554 U.S. at 117.

Indeed, Calfrac seems to recognize as much by arguing that even though it "retains discretion to evaluate claims as the Plan Administrator, nothing in the Administrative Record suggests that it directly did so here." ECF No. 36, at 11. While this fact is apparently undisputed, a single claim is not the relevant level of abstraction for purposes of this analysis. To be sure, *Glenn* holds that a conflict of interest will be found to be reduced where a self-funded plan takes measures to "wall off" claims administrators from those concerned with the firm's coffers. *See id.* But Calfrac offers no facts to suggest that it has erected this kind of firewall, and the court declines to infer its existence from the fact that Calfrac did not intervene in this particular denial of benefits.

Because neither party has provided facts sufficient to result in an upward or downward adjustment of the weight of Calfrac's conflict, the court will incorporate only a modest reduction of deference as part of its arbitrary and capricious review. *See Weber*, 541 F.3d at 1011 ("[W]e will still employ the arbitrary and capricious standard, but we will weigh [the administrator's] conflict of interest as a factor in determining the lawfulness of the benefits denial.").

## III. ANALYSIS

### A. IHC'S PURPORTED ASSIGNMENT

Calfrac first argues that this court cannot reach the merits of IHC's claim under § 1132(a)(1)(B) because that subsection vests a right of action only with a plan's "participant or beneficiary." IHC does not purport to be either, but rather contends it is an assignee of benefits by virtue of a Consent and Conditions of Service form ("Consent Form") executed by T.Q.'s mother, A.Q., on May 20, 2014. Calfrac contests the validity of the assignment. Both parties agree, however, that if the purported assignment is valid, IHC stands in the beneficiary's shoes and "has standing to assert whatever rights [the beneficiary] possessed." *Denver Health & Hosp. Auth. v. Beverage Distribs. Co.*, 546 F. App'x 742, 745 (10th Cir. 2013).

As an initial matter, the court perceives the need to draw an analytical distinction between two concepts related to the Consent Form that have been largely conflated by the parties' briefs. With few exceptions, the parties' analyses of IHC's standing to pursue this action have confused IHC's assignment of benefits with IHC's appointment as an attorney-in-fact (or personal representative) of the beneficiary. These are distinct legal concepts, which is made clear by both the Consent Form *and* the SPD.

IHC's Consent Form reads:

> **8. Assignment of Benefits—Attorney-in-Fact.** By signing below, I hereby assign and transfer to the Facility, and to any other health care provider for whom Facility bills, the benefits of any insurance policy or other arrangement that may provide payment for some or all of my care. I *also* authorize and appoint the Facility and anyone it may designate as my attorney-in-fact for purposes of communicating, appealing, negotiating, or otherwise pursuing in its discretion any or all legal remedies with any Insurance company, group, organization, entity or any other payer to obtain payment for the Facility for the services that were provided to me.

JAR at 1 (emphasis added). Although this provision, as its heading suggests, effects both an assignment of benefits and the appointment of an attorney-in-fact, each sentence has a discrete

6

legal effect. The assignment results in a complete substitution of obligees; the beneficiary transfers any rights to benefits it may have to IHC. The second sentence authorizes IHC to act *on behalf* of the beneficiary, as an attorney-in-fact, rather than transferring any rights to payment.

The SPD similarly contemplates that an appointment of an attorney-in-fact (what the SPD calls a "Personal Representative") is not the same as an assignment of benefits:

> **Personal Representative** means a person (or provider) who can contact the Plan *on the Covered Person's behalf* to help with claims, appeals or other benefit issues. Minor Dependents must have the signature of a parent or Legal Guardian in order to appoint a third party as a Personal Representative. If a Covered Person chooses to use a Personal Representative, the Covered Person must submit proper documentation to the Plan stating the following: The name of the Personal Representative, the date and duration of the appointment and any other pertinent information. In addition, the Covered Person must agree to grant their Personal Representative access to their Protected Health Information. The Covered Person should contact the Claim Administrator to obtain the proper forms. All forms must be signed by the Covered Person in order to be considered official.
>
> **PROCEDURES FOR SUBMITTING CLAIMS**
>
> *Most providers will accept assignment* and coordinate payment directly with the Plan on the Covered Person's behalf. If the provider will not accept assignment or coordinate payment directly with the Plan, then the Covered Person will need to send the claim to the Plan within the timelines discussed below in order to receive reimbursement.

JAR at 126–27 (emphases added). The SPD prescribes procedures by which a third party might act on the beneficiary's behalf, but this is distinct from the SPD's presumption that a beneficiary will execute an assignment of benefits in favor of a provider.

The parties vigorously dispute whether or not the Consent Form satisfied the Plan's requirements for a valid appointment of a Personal Representative. The resolution of this dispute might have been critical to IHC's claim for statutory penalties under § 1132(c)(1) because Calfrac would not be liable for failing to produce plan documents unless IHC had the authority to request those documents on the beneficiary's behalf. However, IHC has conceded that Calfrac is entitled

7

to summary judgment on that claim. (ECF No. 37 at 8). Because that claim is no longer at issue, the court need not decide whether the Consent Form complies with the SPD's Personal Representative requirements.

Whether IHC has standing to pursue its claim for benefits under § 1132(a)(1)(B) turns only on whether T.Q. and IHC have entered into a valid assignment that does not conflict with any terms of the SPD. The court first analyzes the standard of review applicable to Calfrac's refusal to recognize the validity of the assignment, and then turns to the parties' arguments regarding the same.

**1. Relevant Standard of Review**

Calfrac suggests that its decision declining to recognize the validity of the purported assignment is subject to the same arbitrary and capricious standard as its denial of benefits. *See* ECF No. 36 at 9. The court agrees, in part. As explained above, an administrator's entitlement to this deferential standard of review stems only from a plan's reservation, in explicit terms, of some measure of discretion. Here, although the SPD vests Calfrac with sole discretion to interpret the plan, *see* JAR, 31, it does not extend the same to Calfrac's interpretation of extra-Plan documents like an assignment agreement.[4]

Accordingly, to the extent that Calfrac's decision turned on an interpretation of the SPD's requirements for a valid assignment, that determination is reviewed under the arbitrary and capricious standard. However, so far as Calfrac's refusal to recognize the validity of the assignment

---

[4] It is an interesting question whether a plan *could* permissibly allocate to an administrator the discretion to interpret the meaning of a document created entirely outside of the administrator's orbit. It is enough, however, to say that the plan document here did not purport to vest the administrator with such discretion.

rests on an interpretation of IHC's Consent Form rather than the SPD, Calfrac is not entitled to any measure of deference.

Having determined the appropriate standard under which the validity of the assignment will be reviewed, the court turns to the parties' arguments regarding the same.

**2. Does the Consent Form apply to T.Q. in the First Instance?**

First, Calfrac suggests that the Consent Form on which IHC relies did not effectively assign T.Q.'s benefits to IHC because it was executed by his mother, A.Q., and contains a statement indicating that the signer's relation to the patient is "self." *See* ECF No. 22 at 14. Therefore, the assignment may have been valid as to any rights possessed by A.Q., but not to those possessed by T.Q. Relatedly, Calfrac argues that A.Q.'s execution of the Consent Form twenty days before T.Q.'s birth means it could not have been effective as to T.Q. But these arguments reflect a much too narrow interpretation of the Consent Form, and can be dispensed with by analyzing the entire document.

Two provisions of the Consent Form are relevant to Calfrac's argument. First, the document explicates that its signer "intend that the following apply to *all* of my or all of the patient's inpatient and outpatient care and services in facilities owned or operated by IHC Health Services, Inc." JAR, 2 (emphasis added). Later, the Consent Form secures the signer's agreement "that if I am an obstetrical patient admitted for delivery—or spouse of that patient—my signature below extends my consent and agreement to the terms and conditions of this agreement for my infant(s)." JAR, 3.

Together, these provisions extend the scope of the assignment of benefits to *all* medical services provided by IHC to either A.Q. or T.Q. Calfrac's arguments to the contrary are unpersuasive, and it is doubtful that its interpretation of the Consent Form would pass muster even if reviewed under the arbitrary and capricious standard.

9

### 3. Does the Assignment of Benefits Conflict with the SPD?

Calfrac devotes much of its argument section to explaining why the Consent Form did not comply with the SPD's requirements for a valid appointment of a personal representative. But as explained above, an assignment is not interchangeable with the appointment of a personal representative or attorney-in-fact. For purposes of standing to challenge a denial of benefits under § 1132(a)(1)(B), the relevant question is whether the SPD prescribed requirements or procedures necessary for an *assignment* to be recognized as valid by the Plan.

Calfrac directs the court to cases in which providers were found to lack standing to sue under § 1132(a)(1)(B) because the relevant plan documents explicitly forbade assignments. The court finds these cases instructive, but in ways that militate against Calfrac's conclusion.

For example, Calfrac relies on *IHC Health Services., Inc. v. Wal-Mart Stores, Inc.*, No. 2:15-cv-846, 2016 WL 3817682, * (D. Utah July 12, 2016), a case in which a provider asserting an assignment of benefits was found to lack standing because the plan documents expressly proscribed assignment agreements. Calfrac's reasoning breaks down when it attempts to extend that conclusion to this case because the SPD here contains no such prohibition. Indeed, the only inference that can be drawn from the SPD's declaration that "[m]ost providers will accept assignment" is that assignments of benefits are permissive.

Accordingly, the court concludes that IHC is a valid assignee of any benefits due to T.Q. by the Plan, and thus has standing to challenge a denial of such benefits under § 1132(a)(1)(B).

### B. THE DENIAL OF PLAN BENEFITS

In the Tenth Circuit, a court reviewing an administrator's decision that relies on an interpretation of language in an ERISA plan will first determine whether such language is ambiguous. *See Scruggs v. ExxonMobil Pension Plan*, 585 F.3d 1356, 1362 (10th Cir. 2009). In making this determination, a court is to "consider the common and ordinary meaning as a

reasonable person *in the position of the plan participant*, not the actual participant, would have understood the words to mean." *Weber*, 541 F.3d at 1011. If the plan documents as a whole are unambiguous, a reviewing court should construe them as a matter of law. *Weber*, 541 F.3d at 1011.

The parties agree that the SPD establishes the following: (1) prior authorization is required for hospital stays that are longer than 96 hours following cesarean sections, and (2) the penalty for failing to obtain prior authorization is a denial of plan benefits. The parties' main dispute revolves around the applicability and appropriate interpretation of the plan's emergency care exception to the prior authorization requirement.[5]

### 1. Emergency Care Exception

Calfrac's principal argument on this point is that T.Q.'s medical services cannot fall under the plan's emergency exception because his care did not take place in an emergency room. In support, Calfrac suggests that its interpretation of the SPD's emergency care provision is bolstered by the Emergency Medical Treatment and Active Labor Act ("EMTALA"), a statutory scheme not in any way implicated here. Calfrac claims that courts interpreting EMTALA have defined emergency care in a way that would exclude these factual circumstances. Because federal courts have come to this conclusion, Calfrac urges, its own conclusion to this effect cannot be arbitrary and capricious.

---

[5] IHC has additionally suggested that Utah Code § 31A-26-301.6(15) should somehow excuse its coordination of benefits error. The parties' passing allusions to this argument fall far short of the kind of adversarial briefing the court would need to decide (1) whether this statute is preempted by ERISA; and (2) the appropriate interpretation of the provision on which IHC relies. Regardless of the answer to those questions, however, the court fails to see how this provision applies to the posture of this case. IHC has made it abundantly clear that it is bringing this action as an assignee of the Plan's beneficiary, not as a "health care provider . . . seek[ing] recovery from the insurer for an amount improperly paid by the insurer." § 31A-26-301.6(15).

Irrespective of its interpretive value, EMTALA and its judicial interpretations have no place in this court's review because, as the SPD unambiguously explains, "[a]ny review of a final decision or action of the Plan Administrator or the Third Party Administrators shall be based only on such evidence presented to or considered by [them] at the time it made the decision that is the subject of review." JAR, 31; *see Weber*, 541 F.3d at 1011 ("[I]n reviewing a plan administrator's decision under the arbitrary and capricious standard, the federal courts are limited to the administrative record—the materials compiled by the administrator in the course of making his decision."). In its initial determination and throughout a subsequent appeal, UMR failed to offer *any* rationale why the plan's emergency care provision did not excuse T.Q.'s failure to obtain prior authorization. The court declines Calfrac's invitation to impute this EMTALA interpretation to its third-party administrator when the record is devoid of even the most cursory of considerations of the emergency care exception.

Even if the EMTALA analogy were in play, however, the court would find no reason to look beyond the SPD to find the relevant definition of medical services for which the prior authorization requirement is excused. As the SPD explains:

> The Covered Person will not be penalized for failure to obtain Prior Authorization if a Prudent Layperson, who possesses an average knowledge of health and medicine, could reasonably expect that the absence of immediate medical attention would jeopardize the life or long-term health of the individual.

JAR, 109. Calfrac has utterly failed to engage with this language in its initial determination, a subsequent appeal, and before this court. Neither has Calfrac pointed the court to any portion of T.Q.'s condition that would fall below this standard. As a result, the court is left to hypothesize an interpretation of this language that would exclude from its reach the circumstances facing T.Q. upon his premature birth. The court concludes that Calfrac's apparent failure to even consider the applicability of this provision was unreasonable, and therefore arbitrary and capricious.

The only argument advanced by Calfrac that rests on an interpretation of the actual Plan document is the dubious claim that the prior authorization requirement applicable to hospital stays exceeding 96 hours after cesarean section operates independently of the emergency care provision. Stated differently, Calfrac argues that the prior authorization requirement in this particular circumstance is absolute and will admit of no exceptions. The court can confidently declare that such an interpretation of the SPD is unreasonable. The only reasonable interpretation of the relationship between the prior authorization requirement and the emergency care provision is that, when triggered, the emergency care provision relieves the plan's beneficiary of the obligation to obtain authorization prior to receiving *any* care.

The SPD as a whole supports this construction of the emergency services exception. The SPD makes explicit that inpatient hospital stays extending more than 96 hours after cesarean section birth are subject to the prior authorization requirement. JAR, 110. The SPD further makes clear that the penalty for failing to obtain prior authorization is the cost of the services for which prior authorization was not received. *Id.* But the SPD nevertheless declares that "Prior Authorization *may* be required for a stay beyond 48 hours following a vaginal delivery or 96 hours following a Cesarean section." JAR, 109 (emphasis added). That the plan *may* require prior authorization for stays exceeding 96 hours after a cesarean delivery only makes sense when viewed alongside the SPD's dispensation for emergency care. That is, the most plausible interpretation of this language is that it contemplates a scenario where, as here, the newborn or its mother, as a result of childbirth complications, "could reasonably expect that the absence of immediate medical attention would jeopardize the life or long-term health of the individual[,]" thereby obviating the prior authorization requirement.

As explained above, the record does not evidence that UMR considered, either in its initial determination or a subsequent appeal, that T.Q.'s condition might implicate the emergency care exception. Its failure to do so was unreasonable, and therefore arbitrary and capricious. The court further finds that, T.Q., a premature infant weighing 2.93 pounds who required care in the Neonatal Intensive Care Unit, at least initially met the standard prescribed by the SPD to excuse the prior authorization requirement. Consequently, Calfrac's denial of benefits for T.Q.'s care on grounds that prior authorization was not obtained was unreasonable, and therefore arbitrary and capricious.

But this does not end the court's review of Calfrac's denial of benefits. The parties agree that even when the emergency care exception is applicable, the SPD requires that the beneficiary contact the Plan's Utilization Review Organization ("URO") "within 24 hours of the first business day after receiving care or after Hospital admittance." JAR, 109. The parties further agree that such contact was not made here. Nowhere in its administrative determinations or briefs submitted in connection with these motions did Calfrac suggest that this failure should result in a forfeiture of all benefits. The court had assumed that the omission of this argument reflected Calfrac's reasoned decision not to advance an interpretation that stretches the bounds of even the most deferential standard of review. But at the hearing for these motions, Calfrac argued that its discretionary authority would permit its complete denial of benefits when a beneficiary fails to contact the URO after receiving emergency care.

The SPD is far from clear about what happens in the wake of emergency care. And Calfrac is entitled to considerable deference in its resolution of this uncertainty. But the SPD simply cannot support an interpretation by its administrator that results in the penalty of denied benefits for failure to contact the URO. The SPD goes to great lengths to unambiguously alert the Plan's participants and beneficiaries to the circumstances under which the penalty of a complete denial of benefits

will be applied. But nowhere does it alert a beneficiary to the possibility of that penalty upon a failure to contact the URO. And the SPD later injects even more ambiguity into the requirement when it indicates, in connection with the emergency care provision, that "Covered Persons *may* be required to notify the Plan following stabilization." JAR, 126 (emphasis added).

Although a construction of the post-emergency care contact provision that would result in the forfeiture of all benefits due to a failure to contact the URO would be clearly unreasonable, the administrator's discretion undeniably extends to interpreting the operation of this ambiguous provision. A reasonable interpretation may well result in a decrease of benefits owed by the Plan. Calfrac could certainly conclude that, had the URO been contacted as the SPD requires, it could have actively intervened to manage the level and duration of care provided to T.Q. Calfrac could further determine that the URO would have successfully constrained the costs flowing from T.Q.'s hospitalization, whether by requiring a lesser level of care as T.Q. improved, or by requiring his discharge when his condition could have been managed on an outpatient basis.

### C. REMEDIES

The court's determination that Calfrac's denial of benefits was arbitrary and capricious does not automatically entitle IHC to the benefits it seeks. Indeed, the court's "final task is to determine the proper remedy." *DeGrado v. Jefferson Pilot Fin. Ins. Co.*, 451 F.3d 1161, 1175 (10th Cir. 2006). "[W]hen a reviewing court concludes that a plan administrator has acted arbitrarily and capriciously in handling a claim for benefits, it can either remand the case to the administrator for a renewed evaluation of the claimant's case, or it can award . . . benefits." *Id.* (internal quotation marks omitted). A court should award benefits "only if the evidence clearly shows that the administrator's actions were arbitrary and capricious or the case is so clear cut that it would be unreasonable for the plan administrator to deny the application for benefits on any ground."

15

*Caldwell v. Life Ins. Co. of N. Am.*, 287 F.3d 1276, 1289 (10th Cir. 2002) (citation and internal quotation marks omitted).

The only remedy IHC has sought from this court is an award of benefits. But the court cannot say that this determination is so clear "that it would be unreasonable for the plan administrator to deny application for benefits on *any* ground." *Id.* (emphasis added). As explained above, Calfrac retains the discretion to interpret how the plan should take account of a failure to contact the URO, keeping in mind the cost-control rationale underlying that provision. Calfrac's discretion additionally extends to the *reasonable* determination of when T.Q.'s condition no longer constituted an emergency: that is, at what point in T.Q.'s care would it have been unreasonable for "a Prudent Layperson, who possesses an average knowledge of health and medicine, [to] expect that the absence of immediate medical attention would jeopardize the life or long-term health of the individual."

Because Calfrac did not interpret the post-emergency care provision in this case, the matter is remanded to Calfrac to resolve these matters and to arrive at any reduction of benefits flowing from a failure to comply with the post-emergency care contact provision. The court expresses no view on these matters, except to say that Calfrac's discretionary authority must be exercised in good faith, and that its determinations on remand may not contravene the court's conclusion that certain interpretations of the SPD would be arbitrary and capricious.

1. **Attorney's Fees**

Under § 1132(g)(1), a court "in its discretion may allow a reasonable attorney's fee" when a "claimant has achieved 'some degree of success on the merits.'" *Cardoza v. United of Omaha Life Ins. Co.*, 708 F.3d 1196, 1207 (10th Cir. 2013) (quoting *Hardt v. Reliance Standard Life Ins. Co.*, 560 U.S. 242, 245 (2010)). Factors to guide a court's discretion in this aim include:

(1) the degree of the opposing party's culpability or bad faith; (2) the opposing party's ability to satisfy an award of fees; (3) whether an award of fees would deter others from acting under similar circumstances; (4) whether the party requesting fees sought to benefit all participants and beneficiaries of an ERISA plan or to resolve a significant legal question regarding ERISA; and (5) the relative merits of the parties' positions.

*Id.* "No single factor is dispositive and a court need not consider every factor in every case." *Id.*

IHC has requested attorney's fees but has not provided any briefing on the above factors. Calfrac, on the other hand, failed to offer any response to IHC's request for attorney's fees.

The court finds that the second and fifth factors weigh in favor of granting IHC's request. Calfrac is able to satisfy an award of fees, and it could have avoided this litigation by adopting, if only during the internal appeal or pre-litigation negotiations, a reasonable interpretation of the SPD consistent with its status as the Plan's fiduciary. The court finds that the other factors are either neutral, or incapable of being adequately assessed without more information. The court therefore will award a reasonable fee to IHC.

## IV. ORDER

For the reasons above, Defendant's Motion for Summary Judgment is **GRANTED in part and DENIED in part**; Plaintiff's Motion for Summary Judgment is **GRANTED in part and DENIED in part.** Specifically,

1. Defendant's Motion for Summary Judgment on Count I of the Complaint is DENIED.
2. Defendant's Motion for Summary Judgment on Counts II and III of the Complaint is GRANTED.
3. Plaintiff's Motion for Summary Judgment on Count I of the Complaint is GRANTED.
4. Plaintiff's Motion for Summary Judgment on Counts II and III of the Complaint is DENIED.

5. Plaintiff's request for attorney's fees is GRANTED. Plaintiff's counsel should submit its petition for fees within 21 days of this order.

6. Plaintiff's request for prejudgment interest is DENIED as moot.

7. It is ORDERED that the case be REMANDED to Calfrac for proceedings consistent with this order.

Signed September 25, 2018

                                          BY THE COURT

                                          _____
                                          Jill N. Parrish
                                          United States District Court Judge